In the Matter of the QUANTIFICATION OF ENVIRONMENTAL COSTS Pursuant to Laws of Minnesota 1993, Chapter 356, Section 3.

No. CX–97–1391.

Court of Appeals of Minnesota.

May 19, 1998.

Donald W. Niles, Doherty, Rumble & Butler, Minneapolis; Peter S. Glaser, pro hac vice, Doherty, Rumble & Butler, Washington, D.C. for relator Western Fuels Association.

Denis R. Vogel, Jeffrey L. Landsman, pro hac vice, Wheeler, Van Sickle & Anderson, Madison, WI, for relator Dairyland Power Cooperative.

Deborah A. Amberg, Duluth, for relator Minnesota Power and Light.

John A. Knapp, St. Paul, for relator Center for Energy & Economic Development.

Michael C. Connelly, Minneapolis, for relator Northern States Power Company.

Katherine E. Sasseville, Todd J. Guerrero, Fergus Falls, for relator Otter Tail Power Company.

Susan Hedman, pro hac vice, Chicago, IL, Michael D. Madigan, Johnson & Madigan, Minneapolis, for respondent Environmental Coalition.

Heidi Heitkamp, pro hac vice, Lyle G. Witham, Office of Attorney General, Bismark, ND, for respondent State of North Dakota.

Charles S. Miller, Jr., Bismark, ND, for respondent Lignite Energy Council.

Lucinda E. Jesson, Megan J. Hertzler, St. Paul, for respondent Minnesota Public Utilities Commission.

Eric F. Swanson, Joshua S. Wirtschafter, St. Paul, for respondent Minnesota Attorney General.

Barbara E. Freese, Stephen A. Shakman, St. Paul, for respondent Minnesota Pollution Control Agency.

Priti R. Patel, St. Paul, for respondent Minnesota Department of Public Service.

Considered and decided by RANDALL, P.J., and TOUSSAINT, C.J., and MULLALY, J.

## OPINION

RANDALL, Judge.

The Minnesota Legislature directed the Minnesota Public Utilities Commission (the commission) to determine environmental cost values for each method of electricity generation and required utilities to use those values in proceedings before the commission. The commission set interim environmental cost values for five air pollutants on March 1, 1994, including carbon dioxide ($CO_2$). The commission also initiated a contested case proceeding to set final environmental cost values and appointed an administrative law judge (ALJ) to preside over the proceedings. On January 3, 1997, the commission set final values for six air pollutants. The commission established four separate geographic ranges to more accurately represent environmental costs corresponding to pollutants emitted in urban, metropolitan fringe, rural areas, and areas "within 200 miles of the Minnesota border." Several parties objected to the commission's decision concerning the value set for $CO_2$ and requested reconsideration. Upon reconsideration, the commission removed the cost value for $CO_2$ in the 200 mile range, but did not change the values for other pollutants in that range. The relators filed a certiorari appeal alleging that the commission's decision to set values for $CO_2$ was improper. Other parties filed notices of review on separate issues. We affirm.

## FACTS

In 1991, the Minnesota Legislature required utilities to pay for environmental costs as a component of the price paid for the purchase of energy. 1991 Minn. Laws ch. 315, § 1 (amending Minn.Stat. § 216B.164, subd. 4(b)). This statute reflected an "ad-der" approach to paying for environmental damage caused by energy production. In 1993, the legislature, after forming a work group to determine how to implement the statute, repealed the "adder approach" portion of the statute and passed the environmental cost statute (the statute). 1993 Minn. Laws ch. 356, § 1 (deleting "adder approach" from Minn.Stat. § 216B.164, subd. 4(b)); 1993 Minn. Laws ch. 356, § 3 (creating Minn. Stat. § 216B.2422). This statute reflected a "total costs minimization" approach, which attempted to install environmental costs as a factor in resource planning decisions made by the commission. The legislature directed the commission to establish interim environmental cost values by March 1, 1994. Minn. Stat. § 216B.2422, subd. 3(b) (1996).

On August, 17, 1993, the commission initiated an expedited generic administrative process to meet the deadline. The commission established a 110–day period for the parties to submit comments and replies. On March 1, 1994, the commission set interim cost values for five "air emissions most commonly valued in other jurisdictions:" sulfur dioxide ($SO_2$), nitrogen oxides ($NOx$), volatile organic compounds (VOCs), particulates (PM10), and $CO_2$. Regardless of its emission point, $CO_2$ is believed to contribute to global warming, which in turn adversely impacts the global environment.

After setting interim values, the commission initiated a contested case proceeding to set final values. See Minn.Stat. § 216.161 (1996) (defining contested case procedure). The commission appointed an ALJ to preside over the contested case. The ALJ conducted pre-hearing conferences to establish the scope and schedule of the proceedings, allowed parties to present information on several topics including: which pollutants should be valued, geographic sensitivity of the values, methods of establishing values, environmental costs and benefits, and types of electricity generation. The ALJ also noted that parties who disagreed with valuing only certain pollutants had the right, and the burden, to present evidence in an effort to include or exclude pollutants from the commission's determination. The parties filed direct testimony, rebuttal testimony, and sur-rebuttal

testimony between November 1994 and May 1995. The ALJ also held six public hearings and an evidentiary hearing over 27 days. Approximately 50 witnesses testified at the evidentiary hearing.

The Minnesota Department of Public Safety (MDPS) produced expert testimony on a method to determine which environmental costs should be valued and suggested specific criteria as follows: (1) the costs attributable to as many effects of by-products of generation as practical; (2) the by-products that cause the most significant costs; (3) the by-products that are easiest to quantify; and (4) the by-products attributable to the most likely resource decisions over the resource-planning horizon (15 years). The ALJ determined that the use of these criteria would avoid problems such as: spending time and resources on pollutants with minimal impact; attempting to quantify impacts that are extremely difficult to quantify; double counting impacts; and quantifying impacts that are unlikely to exist in the future. Using the criteria proposed by the MDPS, the ALJ recommended limiting consideration to the five air pollutants identified in the interim order and to carbon monoxide (CO). On March 25, 1996, the ALJ issued his findings of fact, conclusions of law, recommendations and memorandum. The ALJ recommended setting the environmental costs of $CO_2$ at $.28 -$2.92 per ton. The ALJ also recommended that separate cost values for each pollutant should be established for urban, metropolitan fringe, and rural areas as well as for pollutants emitted within 200 miles of Minnesota's borders. On January 3, 1997, the commission adopted the ALJ's recommendations and stated that while it was theoretically desirable to adopt values for all environmental costs, it was likely impossible to do so and determined that setting values for selected air pollutants fulfilled the legislature's requirement to establish costs "to the extent practicable."

On September 16 and 17, 1996, the commission heard procedural and substantive arguments. After calculating the present value of the environmental costs, the commission set the environmental cost values of $CO_2$ at $.30 -$3.10 per ton for each of the geographic ranges suggested by the ALJ. Even though $CO_2$ has a global rather than local effect, the commission decided to include a $CO_2$ value for the 200–mile range in order to be consistent with the other air pollutant values. Several parties requested rehearing or reconsideration. The commission granted the requests.

On July 7, 1997, after reconsideration, the commission modified its order to remove $CO_2$ values for the 200–mile range due to concerns about the practicality of requiring utilities not located in Minnesota to apply the values, the lack of additional "analytical" benefit in applying the values, and for reasons of comity. The commission stated that it believed that it could require out-of-state utilities to use the values and that it still intended to use socio-economic costs for utilities not located in Minnesota. The relators petitioned for review by writ of certiorari, and all other parties filed notices of review.

## ISSUES

1. Is the commission's order ripe for consideration?

2. Did the commission act improperly in determining $CO_2$ values?

3. Are the constitutional challenges ripe for consideration?

## ANALYSIS

As an initial matter, the relators filed a motion with this court to supplement the record with a commission order. Relators seek to rely on this order to establish that the commission will use the environmental cost values to the relators' detriment. At oral argument this court allowed the parties to submit written argument on whether we should supplement the record with a commission order. The motion is granted.

## I.

The environmental cost statute provides:

The commission shall, to the extent practicable, quantify and establish a range of environmental costs associated with each method of electricity generation. A utility shall use the values established by the commission in conjunction with other external factors, including socioeconomic costs, when evaluating and selecting re-

source options in all proceedings before the commission, including resource plan and certificate of need proceedings. Minn.Stat. § 216B.2422, subd. 3(a) (1996).

■ Whether an issue is ripe for judicial review depends on "'the fitness of the issues for judicial decision'" and "'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)).

■ The commission, although conceding that its order setting environmental cost values is a "final order," asserts that because it retains considerable discretion in determining how to use the values in future proceedings, but has not yet done so, any challenges to the commission's order setting values will only be ripe after it fulfills the statue's requirements by applying the values in future proceedings. We disagree. As to the first part of the ripeness test, the main challenges to the commission's order concern whether the commission acted improperly in (1) setting values for CO2, (2) determining values for air pollutants only, and (3) setting the CO2 value in the 200–mile range at zero after reconsideration. These challenges arose out of the contested case proceeding before the commission and a detailed record containing the commission's orders, written and oral testimony, written and oral legal arguments, documents, and the ALJ's orders and recommendations was developed. On the basis of this extensive record, we can determine whether the CO2 values are arbitrary or capricious or are not supported by substantial evidence; and whether the commission exceeded the legislature's intent in deciding to determine values for only air pollutants or to limit application of those values to the state's borders. *See Buhs v. State, Dep't of Pub. Welfare*, 306 N.W.2d 127, 131–32 (Minn. 1981) (rejecting agency's statutory interpretation as being against legislative intent); *Markwardt v. State, Water Resources Bd.*, 254 N.W.2d 371, 374–75 (Minn.1977) (applying arbitrary and capricious standard); *In re Application of Interstate Power Co. for Auth. to Increase Rates for Elec. Serv. in Minn.*, 500 N.W.2d 501, 504 (Minn.App.1993) (applying substantial evidence standard). Thus, the challenges to the commission's order to set values are fit for review.

In the second part of the ripeness test, the relators, relying on *Contel of Minn., Inc. v. Minnesota Pub. Utils. Comm'n (In re Investigation into Intra–LATA Equal Access & Presubscription)*, 532 N.W.2d 583 (Minn. App.1995), *review denied* (Minn. Aug. 30, 1995), argue they will suffer hardship because if they do not appeal the commission's final order to set CO2 values now, they will not be permitted to challenge the values in the future. In response, counsel for the commission stated at oral argument that the values are "not concrete," "not imminent," and are "in ranges." The commission, also at oral argument, conceded that parties may appeal those values when they are actually applied in proceedings before the commission and if and when the values are changed and applied in the future.

In *Intra–LATA*, this court considered a case where the commission finished its decision making process in determining whether to require equal access presubscription, and because no appeal was taken from that decision, this court declined to review that determination. *Id.* at 589. Although *Intra–LATA* dealt with additional issues not before us in the present case, it is instructive for the proposition that, under certain circumstances, a party may lose its right to challenge a final order. Additionally, because the commission's order is a final order, *see* Minn.Stat. § 237.26 (1996) (stating commission's decision is final if no appeal taken), and because the statute clearly requires the commission to use the values in some manner, *see* Minn.Stat. § 216B.2422, subd. 3(a) ("A utility shall use the values established by the commission * * *."), we determine that the relators may suffer hardship if we do not review their challenges to the commission's order setting CO2 environmental cost values. Moreover, if we do not consider the values now, a party who appeals later will likely raise the same issues as those before the court in the present case. Thus, review is now appropriate, where a full record and many interested parties are before us.

We note that at oral argument, counsel for the commission categorically assured this court, and the other parties, that when the commission applies or changes the values, parties who feel aggrieved by the values may appeal. We take the commission at its word.

## II.

■ On writ of certiorari, we determine whether the Commission violated the constitution, exceeded its authority, engaged in unlawful procedure, erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously. *Intra–LATA*, 532 N.W.2d at 588. *See* Minn. Stat. § 14.69 (1996) (stating standards of judicial review in contested cases).

■ "Substantial judicial deference must be accorded to the fact finding processes of an administrative agency." *Brinks, Inc. v. Minnesota Pub. Utils. Comm'n*, 355 N.W.2d 446, 449 (Minn.App.1984). An agency's expertise is entitled to deference from reviewing courts, and the agency's decision is presumed correct. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). Reviewing courts are not bound by the agency's decisions on questions of law and need not defer to the agency's expertise. *No Power Line, Inc. v. Minnesota Envtl. Quality Council*, 262 N.W.2d 312, 320 (Minn.1977). If an agency's decision represents its will and not its judgment, the decision is arbitrary and capricious. *Markwardt*, 254 N.W.2d at 374.

■ When an agency hears and receives evidence in order to make a factual determination, acts as a trial judge sitting without a jury, and makes findings of fact, it is acting in a quasi-judicial manner and will be reviewed on the substantial evidence standard. *St. Paul Area Chamber of Commerce v. Minnesota Pub. Serv. Comm'n*, 312 Minn. 250, 259–60, 251 N.W.2d 350, 356 (1977).

[W]hen applying the substantial evidence test to that type of finding, the reviewing court should determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record.

*Minnesota Power & Light Co. v. Minnesota Pub. Utils. Comm'n*, 342 N.W.2d 324, 330 (Minn.1983).

The relators, Lignite Energy Council (LEC), and the Environmental Coalition (the EC) assert challenges to the commission's order setting environmental cost values for $CO_2$. The relators argue that (1) the commission should not be entitled to great deference because the commission was acting outside of its realm of expertise; (2) the commission decision to set values for $CO_2$ was not supported by substantial evidence and/or its decision was arbitrary and capricious because the testimony of Dr. Ciborowski, an expert witness, (and the bases for his testimony) was grounded in incomplete data, speculation, conjecture, and uncertainty; and (3) there is no substantial evidence that $CO_2$ causes or contributes to serious environmental damage. We address each contention in turn.

*Was the commission acting within its realm of expertise?*

■ The relators argue that no special deference is due to the commission because it was not acting within its realm of expertise in evaluating global economic conditions, the scientific properties and analysis of $CO_2$, and the effects of $CO_2$ on the environment. We disagree. Here, the legislature assigned the task of determining environmental cost values to the administrative agency it presumably thought would be most appropriate to take on this responsibility. There is no challenge that the legislature made an improper delegation of authority to the agency, and it is fundamental that the courts cannot take on the functions of administrative agencies without violating the separation of powers. *Arrowhead Bus Serv., Inc. v. Black & White Duluth Cab Co.*, 226 Minn. 327, 329, 32 N.W.2d 590, 592 (1948). Thus, this court will not substitute its judgment for the commission's in such a situation. *See Gibson v. Civil Serv. Bd.*, 285 Minn. 123, 126, 171 N.W.2d 712, 715 (1969) (stating district courts and appellate courts should avoid "substituting their judgment concerning the inferences to be drawn from the evidence for that of the agency").

*Was the commission's decision concerning the CO 2 values proper?*

There is considerable debate as to which standard of review applies. Here, the ALJ heard evidence in the form of oral and written testimony, weighed the evidence on a preponderance of the evidence standard, and made findings of fact concerning environmental cost values. Further, the commission chose to employ a contested case procedure. Given these circumstances, the commission acted in a quasi-judicial capacity in determining facts and in resolving the rights of the parties, and as such, its decision is subject to the substantial evidence test.

The relators argue that the speculative nature of the evidence (specifically Dr. Ciborowski's testimony) on which the commission relied in setting the CO2 values shows that commission's decision is not supported by the record. We disagree. Here, the record shows that Dr. Ciborowski's testimony and recommendations, as relators contend, are based on some assumptions, speculations, and uncertainties in data. But the ALJ conducted a careful review of (1) Intergovernmental Panel on Climate Change (IPCC) research and the peer review process; (2) research on CO2 values by other scientific review panels; (3) the uncertainties in the scientific reports and how the uncertainties are acknowledged in the scientific community; (4) Dr. Ciborowski's testimony and the basis for his testimony; (5) damage estimates; (6) discount rates; (7); the Minnesota Pollution Control Agency's and the Attorney General's recommended values; and (8) several parties' recommendations that a zero value be used. The ALJ determined that some testimony and suggestions were supported by the evidence and others were not, and explained the bases for his determinations.

Further, the ALJ noted that the parties had a sufficient opportunity for thorough cross-examination in his determination that Dr. Ciborowski was qualified to give an expert opinion. This determination appears to be within the ALJ's broad discretion. *See In re Proposed Suspension of Nursing Home Licenses of Parkway Manor Healthcare Ctr.,* 448 N.W.2d 116, 118 (Minn.App.1989) (applying abuse of discretion standard used in dis-

trict court proceedings to ALJ discovery decision), *review denied* (Minn. Jan. 18, 1990).

Furthermore, in its order, the commission explained its decision to set the values on the following factors (1) the IPCC report was the most accurate and useful source available; (2) some expert testimony and suggested ranges were more strongly supported by the evidence than others; (3) Dr. Ciborowski's approach was supported by the evidence; (4) the experiences of New York in setting environmental costs; and (5) the uncertainties inherent in the research would be taken into account by using a lower estimate of global damage and a higher damage discount rate. The commission also argues that it believed it should attempt to do what was practicable, given the uncertainties, instead of doing nothing as LEC's argument implies. Under these circumstances, the commission based its decision on sufficient evidence in the record (primarily the IPCC report and Dr. Ciborowski's testimony and recommendations) and has given an adequate and reasonable explanation of its decision.

*Was the commission's decision that CO2 negatively affects the environment supported by the evidence?*

Given the above analysis, the commission properly relied on Dr. Ciborowski's expert testimony and the IPCC report. Here, the ALJ and commission made findings of fact and adequately explained the basis underlying the determinations. Additionally, the commission acted pursuant to a valid delegation of authority from the legislature in an area in which the courts are not accustomed to dealing. *See Hennepin County Court Employees Group v. Public Employment Relations Bd.,* 274 N.W.2d 492, 494 (Minn.1979) (stating court defers to agency when issue is not within court's particularized experience and expertise). Accordingly, we conclude that the commission's determination that CO2 negatively affects the environment was proper.

While we acknowledge the concerns about the uncertain and speculative nature of the available data, we are disinclined to prohibit the state from directing its instrumentalities to engage in environmentally-conscious planning strategies. Hopefully, the administra-

tive process ensures the use of the best information available and takes precautions to guard against the dangers surrounding the use of such data. Here, the process adequately explained its decisions.

The second main set of substantive challenges is raised by LEC, a non-profit trade association representing the interests of lignite fuel producers, users, and suppliers. LEC argues that (1) the language of the statute directs the commission to consider environmental costs of "each method" of electricity generation and that (2) the commission relied on testimony that did not provide an adequate basis to establish the criteria. We disagree. The commission used the criteria in an attempt to give meaning to the phrase "to the extent practicable." During the contested case procedure, the parties had opportunities to present and debate methods of valuing environmental costs. After considering the evidence and arguments before him, the ALJ recommended adopting the criteria proposed by the MDPS to determine which costs to value.

The ALJ explained that the criteria would screen out pollutants that have insignificant impact, are difficult to quantify, and are not relevant. Further, the ALJ reasoned that using the criteria would avoid "double-counting" of environmental impact and would ensure the best use of scarce resources. The ALJ also discussed why other methods and environmental costs were not appropriate. The commission followed the ALJ's recommendation to adopt the criteria. This decision takes into account the concerns and interests of the parties and allows for an interpretation that does not conflict with the statutory language. See Geo. A. Hormel & Co. v. Asper, 428 N.W.2d 47, 50 (Minn.1988) (stating courts uphold agency's interpretation of statutes that agency administers unless interpretation conflicts with statute's purpose and legislative intent). We also note the commission's January 3, 1997, order stated that it may consider other pollutants in subsequent proceedings and that the parties are not precluded from submitting additional evidence. Further, at oral argument the commission agreed that parties may appeal an adverse decision.

■ The LEC also argues that the ALJ improperly shifted the commission's burden of proof to the LEC in requiring the LEC and other parties to present evidence concerning the environmental costs of other methods of power generation. We disagree. The statute does not contain a clear statement that the evidentiary standard should be replaced by a new standard that is not defined and is not used by the courts. Further, in typical contested case procedure, the parties bear the burden of establishing their position to the agency. Here, the parties had sufficient opportunity to present and develop the record through testimony, documents, and oral argument. Accordingly, the commission's determination that parties must present a preponderance of the evidence to support their arguments is consistent with established contested case procedure. See Resident v. Noot, 305 N.W.2d 311, 312 (Minn. 1981) (stating courts will defer to agency's interpretation of its own rule if it "is one of long standing").

■ In the third main challenge to the commission's order, the EC argues that the commission acted in an arbitrary and capricious manner, and against legislative intent, when it decided, upon reconsideration, to set environmental costs for $CO_2$ outside of the state's borders at zero after explicitly determining that it was practical to do so. The EC also asserts that because $CO_2$ affects the global environment regardless of its source, the 200–mile range is not proper. We disagree. In its order after reconsideration, the commission noted that it accepted the arguments from out-of-state energy providers that the inclusion of $CO_2$ values would be overly burdensome to the providers and would produce little additional analytic benefit. The commission's decision upon reconsideration to remove the $CO_2$ value for the 200–mile range can be fairly characterized as a decision to give meaning to the "to extent practicable" statutory language; at least we cannot conclude that the commission's characterization is reversible error. Given the legitimate reasons presented by the commission, we cannot say that the commission's interpretation of the statutory language is contrary to legislative intent. As such, we do not consider whether the commission could properly rely on notions of comity to support its determination. On this record, we uphold

the commission's decision to remove the $CO_2$ value for the 200–mile range.

### III.

LEC and respondent State of North Dakota stated at oral argument that unless this court reinstates the original $CO_2$ value for the 200–mile range, its constitutional challenges are not ripe for judicial consideration. Because we affirm the commission on this issue, and do not reinstate the $CO_2$ value, we do not reach the constitutional challenges raised by LEC and North Dakota.

### DECISION

The commission's order to set environmental costs for $CO_2$ is ripe for judicial review. The parties claiming to be adversely affected when actual implementation takes place are not precluded from further appellate review. The commission's order concerning $CO_2$ environmental costs is supported by substantial evidence, not contrary to legislative intent, and is not contrary to law. Because of our decision, we do not reach the constitutional challenges.

**Affirmed and motion granted.**